DECISION
{¶ 1} Relator, Donald Lawson, commenced this original action requesting a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order terminating permanent total disability ("PTD") compensation and finding fraud, and to issue an order continuing compensation.
 {¶ 2} Pursuant to Civ.R. 53(C), and Loc.R. 12(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate who issued a decision including findings of fact and conclusions of law. (Attached as Appendix A.) In her decision, the magistrate found that there was "some evidence" to support the commission's determination that relator was capable of performing sustained remunerative employment. The magistrate also found that there was "some evidence" to support the commission's determination of fraud. Therefore, the magistrate recommended that the requested writ of mandamus be denied.
 {¶ 3} Relator has filed objections to the magistrate's decision arguing that the commission could not have found fraud because the commission was aware that relator was a member of city council and went to monthly city council meetings. Relator also argues that his ability to do some work-like activities did not establish that he was capable of sustained remunerative employment. Lastly, relator argues that, even if he had the physical capacity to work, his psychiatric condition prevented him from any sustained remunerative employment. We do not find relator's objections persuasive.
 {¶ 4} As noted by respondent, the commission had before it evidence indicating that relator engaged in a variety of activities not normally associated with service on city council. These activities included hauling and dumping refuse, plowing snow, mowing lawns, and hauling gravel. There was also evidence showing that relator was capable of lifting objects well in excess of the sedentary strength range. Nevertheless, in his vocational evaluation questionnaire, relator failed to disclose any of these activities. Relator also represented that he had not performed any physical labor in ten years. This was "some evidence" upon which the commission could rely in finding fraud.
 {¶ 5} These activities are also "some evidence" supporting the commission's determination that relator was capable of sustained remunerative employment. As noted by the magistrate, "sustained remunerative employment includes part-time work and irregular work." State ex rel. Kirby v. Indus. Comm., 97 Ohio St.3d 427, 2002-Ohio-3316; State ex rel. Toth v. Indus. Comm. (1997), 80 Ohio St.3d 360. Moreover, the fact that relator's claim included a psychiatric condition is irrelevant if there is "some evidence" that relator is capable of performing sustained remunerative employment.
 {¶ 6} Following an independent review of this matter, we find that the magistrate has properly determined the pertinent facts and applied the appropriate law. Therefore, we adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein. In accordance with the magistrate's decision, we deny the requested writ of mandamus.
Objections overruled;
Writ of mandamus denied.
 DECISION IN MANDAMUS {¶ 7} In this original action, relator, Donald Lawson, asks this court to issue a writ of mandamus compelling respondent Industrial Commission of Ohio ("commission") to vacate its order terminating compensation for permanent total disability ("PTD") and finding fraud, and to issue an order continuing compensation.
Findings of Fact:
 {¶ 8} 1. In March 1994, Donald Lawson ("claimant") filed an application for PTD compensation in his workers' compensation claim. In October 1995, the application was granted by the commission.
 {¶ 9} 2. In 2001, the Bureau of Workers' Compensation ("bureau") conducted an investigation into claimant's activities while receiving PTD compensation. Witnesses stated that claimant engaged in snow-plowing, lawn-mowing, and clean-up activities. Investigators gathered information that claimant repaired a snow plow and plowed snow in March 1993. The county landfill showed that claimant dumped refuse on 17 occasions in 1995, 19 occasions in 1996, 23 occasions in 1997, 21 occasions in 1998, 23 occasions in 1999, and on similarly numerous occasions in 2000 and 2001. From 1994 to 2001, claimant put up the village flags on holidays, and he hauled gravel 11 times from January to April 2000.
 {¶ 10} 3. Investigators also conducted surveillance. On one occasion, they observed claimant driving the village's dump truck and loading debris into the truck, lifting a couch onto the truck, and driving the truck to the landfill. Claimant backed the truck to the dumping area, untied the ropes holding down the debris, and dumped it. Investigators observed claimant doing similar activities on another day when he loaded scrap metal onto the dump truck, broke apart a table and loaded it onto the truck, picked up a lawn mower with a helper and loaded it onto the truck, and loaded other items of debris, driving the truck to several locations. On another day, claimant was observed driving the dump truck loaded with tires and stopping at various locations. At one stop, claimant threw a rope over the debris in the back, pulled the rope down to fasten the load, and then threw a second rope over the truck.
 {¶ 11} 4. The mayor of the village stated that claimant had been on the village council for the last 18 years. Claimant had been involved in hauling gravel, hauling brush, snow removal, emptying garbage cans, and cutting trees after storm damage. He stated that claimant kept the village dump truck at his house as well as the flatbed truck. If anyone needed something hauled to the county landfill, claimant was the one who did it, for which he was paid at an hourly rate. The village had several miles of roads, and claimant would buy patching material and fill the potholes and cracks in the street. Claimant was responsible for getting the snow plow on and off the flatbed truck and for performing the plowing, for which he was paid at an hourly rate by the village. Claimant was the only council member to engage in these activities. The mayor also stated that claimant did snow-plowing for a local school district. In addition, claimant cut the grass on the village property and ditch lines, using a push mower and weed eater, and he also cut about five lawns for residents. Claimant kept the village's lawnmower, trimmer, and chainsaw at his residence.
 {¶ 12} 5. The chief of police testified that he paid claimant in cash for mowing his lawn and also paid claimant for building him a piece of furniture, a hutch-sideboard. He described seeing claimant in 1995 or 1996 working on a roof, assisting with installing metal peaks. The chief also testified that, for Memorial Day, Fourth of July, and Labor Day, claimant drove the dump truck to each post or telephone pole in the village, got into the dump bin and raised it, providing elevation to put the flags in place. He removed the flags as well. The chief also confirmed that claimant patched the village roads.
 {¶ 13} 6. Investigators took photographs and made a videotape of claimant's activities. They also gathered additional documents as described in the commission's order below.
 {¶ 14} 7. Investigators submitted the photographs and videotape to a physician, David R. Dunkin, D.O., and asked him to review them together with the medical reports in claimant's file, including the reports on which PTD had been based. Dr. Dunkin provided an evaluation in which he recited the medical restrictions found by the commission in the order granting PTD and also described the videotape and photographs as follows:
 {¶ 15} "Review of videotape and still photos taken by special agent Aspey on 4/28/01 documents injured worker lifting full-sized sofa onto a truck over the sides which are over six feet from the ground. Injured worker then climbed into the truck to position the sofa. Injured worker showed no sign of difficulty climbing into or out of this truck. Worker was recorded helping with a village spring between a[t] this date. Worker was noted to continue picking up items which far exceeded his 10 pound weight limit from the ground which also exceeded restrictions for repeated bending, twisting and lifting items below the level of his knee. Worker is recorded for over 2 hrs. on 4/28/01 performing these activities. Other items noted to be picked up for [sic] a large motor over 3 feet long as well as assisting and lifting an 8 foot long wooden table after kicking it apart, and a lawnmower all lifted over the sides of this truck. Claimant also individually lifted a steel deck chair and hoisting it over the side of this truck. He is documented twisting and forcefully turning to tear apart another item later. Second date of recording on 5/5/01 again records injured worker throwing a rope across a load of trash in the same truck and tightening it down to secure the load. These motions also exceed the restrictions recommended by previous physicians in determining and granting permanent total disability. Affidavit from the town Mayor, Charles Pennington[,] document injured worker mows village property with a push lawnmower and is also known to mow lawns for five other individuals in town. Affidavit further documents injured worker has assisted with spring village [clean up] for the past 18 years. Claimant also assists the village cutting up down trees from storms, emptying village garbage cans for the village. Report from Agent Aspey indicates that claimant denied lifting any items during the village [clean up] and when confronted with the fact that he was filmed lifting multiple items of debris, the injured worker became angry and refused to speak any further with agent Aspey.
 {¶ 16} "Conclusion: Claimant has been well documented through both still photos and videorecordings performing activities which far exceeded restrictions of activity which were the grounds for granting permanent and total disability, i.e. restrictions of lifting no greater than 10 pounds, repeated bending or lifting objects below the level of the knee, repeated rotatory movement of the lumbar spine and lifting objects above the level of the shoulders. Violation of all of these restrictions have been documented and are not consistent with the injured worker being permanently and totally disabled based upon these restrictions."
 {¶ 17} 8. In December 2001, the bureau filed a motion asking the commission to terminate PTD and declare fraud.
 {¶ 18} 9. On February 13, 2002, a hearing was held. In the resulting order, a staff hearing officer ("SHO") found that claimant had not engaged in sustained remunerative employment and, therefore, the SHO denied the bureau's motion.
 {¶ 19} 10. The bureau sought reconsideration, and the commission granted a new hearing on the grounds that the SHO had applied an incorrect legal standard.
 {¶ 20} 11. In August 2002, the commission heard the bureau's motion, and a majority of commissioners found fraud and granted the motion as follows:
 {¶ 21} "* * * The Staff Hearing Officer denied the motion finding that the injured worker had not been engaged in sustained remunerative employment. The appropriate legal standard is whether the injured worker is `capable' of engaging in sustained remunerative employment pursuant to the holding in State ex rel. Frazier v. Conrad (2000), 89 Ohio St.3d 166. Therefore, the Staff Hearing Officer's order contains a clear mistake of law. Accordingly, under its authority of continuing jurisdiction, the Commission finds that grounds exist to reconsider the underlying Administrator's motion.
 {¶ 22} "On 10/12/1995, the Industrial Commission awarded the injured worker permanent total disability compensation commencing 05/14/1994, which he has continued to receive through the present time. The Administrator, in its motion filed 12/06/2001, has requested the termination of permanent total disability benefits and a finding of fraud, based on the injured worker's activities since at least March 1993. The activities are detailed in the attachments filed with the motion, and include refuse hauling and dumping, snow plowing, lawn mowing, gravel hauling, and town hall and village clean up. Most of the activities in question were performed by the injured worker in connection with his position as a member of the village council of the Village of West Elkton, Ohio. Included in the attachments are affidavits of the mayor, police chief, and several other residents of West Elkton, which describe the injured worker's activities, listed above, in the Village over the past ten years. Also included is a videotape surveillance evidence of some of the aforementioned activities of the injured worker, including trash hauling, and village cleanup on 04/28/2001 and 05/05/2001, which show the injured worker lifting objects well in excess of the sedentary strength range.
 {¶ 23} "On 10/12/1995, the injured worker was awarded permanent total disability on the basis that he was limited to performing sedentary, low-stress, simple task work, and that his non-medical disability factors precluded him from obtaining and performing such work. Therefore, in granting the award, the Commission considered both physical impairment and non-medical disability factors. Also submitted with the Administrator's motion, filed 12/06/2001, was a medical review by Dr. David Dunkin, dated 08/27/2001. Dr. Dunkin concluded that the injured worker has been well documented in both still photos and video recordings performing activities, which far exceeded restrictions of activity which were the grounds for granting permanent total disability.
 {¶ 24} "Submitted with the original permanent total disability application was a vocational evaluation questionnaire, completed and signed by the injured worker on 08/08/1995. Question number 6e. on that questionnaire asks the injured worker to list other activities that he does or has done that may be related to work, including volunteer or other services which have been mentioned elsewhere in the questionnaire. The injured worker answered this question by stating that he watched his wife's shop for a while when she went to work. When asked at hearing why he did not list any other activities that he performed, in response to question number 6e., he stated that he did not remember. The Commission notes that on the activity spreadsheet attached to the Administrator's motion, the injured worker dumped refuse twice on 08/07/1995, the day before he filled out and signed the vocational evaluation questionnaire. Under question number 9c. on the questionnaire, the injured worker stated that he had done no physical labor in ten years.
 {¶ 25} "It is the finding of the Industrial Commission that the injured worker has been engaged in physical activity since 1993 which demonstrates that he is capable of performing sustained remunerative employment. In reaching this decision, the Commission relies upon the evidence submitted with the Administrator's motion, including, but not limited to, the affidavits and videotape evidence. This evidence substantiates a regular pattern of work activity of the past nine years, some of which was physical activity well in excess of the sedentary restrictions relied on in the decision to grant the injured worker's permanent total disability application. The Commission further relies on the report of Dr. Dunkin, dated 08/27/2001, in support of this finding.
 {¶ 26} "Therefore, the Commission grants the Administrator's motion * * *. It is ordered that the injured worker's permanent total disability compensation is terminated. All prior and subsequent permanent and total disability compensation paid to the injured worker since 05/14/1994 is vacated and declared overpaid * * *.
 {¶ 27} "Additionally, the Commission finds that the injured worker fraudulently obtained the award of permanent total disability benefits based on his intentional failure to disclose to the Commission — notably, on the vocational evaluation questionnaire — the physical activities which he was performing, which are the basis of the Commission's finding that he is capable of performing sustained remunerative employment. The elements supporting a finding of fraud are that the injured worker 1) had a duty to disclose such activities to the Commission at the time his permanent and total disability application was being considered; 2) such a disclosure was material to the issue of determining whether he should be awarded permanent and total disability benefits; 3) his failure to disclose was made with the knowledge of the falsity of the answer to the questions on the questionnaire; 4) with an intent to mislead the Commission to rely on it; 5) the Commission did rely on the misrepresentation or failure to disclose the material information; and 6) the Bureau and Commission have suffered an injury as a result by granting the injured worker's application, and paying permanent and total disability compensation to him since 05/14/1994. Therefore, the overpayment declared above shall be recouped pursuant to the fraud provisions of R.C. 4123.511(J)."
Conclusions of Law:
 {¶ 28} In this original action in mandamus, the claimant argues that the commission abused its discretion in finding fraud and terminating PTD compensation. Claimant argues that his physical activities were not extensive and were merely part of his community involvement and within his duties as an elected official of the community.
 {¶ 29} Several established principles apply to the court's consideration. First, after the commission awards PTD compensation, it may exercise continuing jurisdiction to terminate compensation when the claimant (1) has engaged in activities inconsistent with permanent total disability, (2) has engaged in sustained remunerative employment, or (3) is capable of engaging in some form of sustained remunerative employment. State ex rel. Kirby v. Indus. Comm., 97 Ohio St.3d 427,2002-Ohio-6668; State ex rel. Frazier v. Conrad (2000), 89 Ohio St.3d 166; State ex rel. Smothers v. Mihm (1994), 69 Ohio St.3d 566; State ex rel. Schultz v. Indus. Comm., 96 Ohio St.3d 27, 2002-Ohio-3316 (upholding termination of compensation based on activities inconsistent with PTD where there was evidence of part-time work activities but no evidence of pay); State ex rel. Holt v. Indus. Comm. (Oct. 26, 2000), Franklin App. No. 00AP-1 (upholding termination of PTD where there was evidence of recreational/sports activities inconsistent with PTD but no evidence of employment).
 {¶ 30} Next, the magistrate notes that the concepts of "work" and "employment" are not limited to physical activity or manual labor. State ex rel. Ackerman v. Indus. Comm., 99 Ohio St.3d 26, 2003-Ohio-2448
¶ 39 (stating that the bureau need not show "physical activity" for a termination of PTD because sedentary activities constitute sustained remunerative employment, including "those administrative and executive decisions necessary to the management of a business"). For example, a person who supervises others and arranges for supplies to be purchased may be engaged in work activity. E.g., State ex rel. Kasler v. Indus. Comm. (Feb. 15, 1996), Franklin App. No. 95AP-341; State ex rel. Nahod v. Indus. Comm. (Sept. 2, 1999), Franklin App. No. 98AP-1157.
 {¶ 31} This is not to say that a person receiving disability compensation cannot have personal investments and give reasonable attention to them. See Ackerman, supra (noting that the mere fact of business ownership, without more, does not defeat eligibility for PTD compensation). In cases involving temporary total disability ("TTD"), the courts have recognized that, where the injured worker had a preexisting business to which he gave substantial labor and supervision before the injury, and where he was forced to hire laborers to replace his physical contribution during his recuperation, the claimant may engage in some supervisory activities to preserve his business during recuperation while receiving TTD compensation. State ex rel. Ford Motor Co. v. Indus. Comm., 98 Ohio St.3d 20, 2002-Ohio-7038; see, also, State ex rel. Am. Std., Inc. v Boehler, Franklin App. No. 01AP-1138, 2002-Ohio-3323. Depending on the circumstances, however, the commission may conclude that a claimant's activities in operating a business are not consistent with receipt of disability compensation. See Nahod; Schultz, supra; State ex rel. Rousher v. Indus. Comm. (Feb. 3, 2000), Franklin App. No. 99AP-286. Further, the magistrate notes that sustained remunerative employment includes part-time work and irregular work. State ex rel. Toth v. Indus. Comm. (1997), 80 Ohio St.3d 360; Kirby, supra.
 {¶ 32} With respect to volunteer work, the magistrate notes that such work may be inconsistent with receipt of PTD where it demonstrates a capacity to perform sustained remunerative work. See Schultz, supra, at ¶ 61 (stating that a claimant who performs sustained "remunerable" activity without pay demonstrates that he or she is capable of doing that same work for remuneration); State ex rel. Alesci v. Indus. Comm.,97 Ohio St.3d 210, 2002-Ohio-5932 ¶ 18 (stating that a claimant who does sustained "remunerable" activity without pay demonstrates the capability of doing that same work for remuneration); Kirby, supra, at ¶ 11 (stating that, "even if claimant charged no money at all, his ability to do these jobs contradicts his assertion that he is medically and vocationally unable to do any work"). See, also, State ex rel. Menough v. Indus. Comm., Franklin App. No. 01AP-1031, 2002-Ohio-3253 (adopting magistrate's conclusions relating to PTD and fraud, including the conclusion that, if a PTD recipient were donating clerical services to a charity five hours per day, five days per week, that activity could support a termination of PTD regardless of the absence of monetary gain). However, in cases involving TTD, volunteer work does not preclude TTD compensation where the claimant is not remunerated and the duties are not medically inconsistent with the claim of inability to perform the former position of employment. State ex rel. Parma Community Gen. Hosp. v. Jankowski, 95 Ohio St.3d 340, 2002-Ohio-2336.
 {¶ 33} The magistrate further observes that the commission, as the finder of fact, has broad discretion to determine whether the evidence shows that the claimant is capable of performing sustained remunerative employment. See, generally, State ex rel. Pass v. C.S.T. Extraction Co. (1996), 74 Ohio St.3d 373; State ex rel. Burley v. Coil Packing, Inc. (1987), 31 Ohio St.3d 18. For example, in [State ex rel] East Ohio Gas Co. v. Indus. Comm. (May 18, 2000), Franklin App. No. 99AP-911, the employer presented videotapes that showed claimant performing strenuous activity and heavy lifting on several occasions, which tended to show that claimant had not accurately represented his limitations to the examining physicians. The claimant testified, however, that he sometimes had good days and could perform such activities briefly. The commission, in its discretion as the finder of fact, accepted claimant's testimony and rejected the argument that the activities shown on the videotape were inconsistent with PTD. In contrast, the commission in the present case viewed the evidence as indicative of physical capacities and skills inconsistent with PTD, and it cited evidence to support its findings of fact.
 {¶ 34} In regard to fraud, the magistrate notes that it is well settled that a person's silence, where there is a duty to disclose, constitutes a misrepresentation that can support a finding of fraud. Ackerman, supra, at ¶ 44. See, generally, Schubert v. Neyer (1959), 165 N.E.2d 226, 229; State v. Warner (1990), 55 Ohio St.3d 31, 53.
 {¶ 35} Here, the commission relied on an array of evidence showing that claimant was capable of physical activities such as lifting heavy debris, loading trucks, driving trucks, operating a chainsaw, mowing multiple properties, climbing onto a truck bed repeatedly, patching pavement, and operating a dump truck. In addition, the commission relied on a medical expert who opined that claimant's activities were inconsistent with the functional restrictions on which the award of PTD had been based. The evidence also showed that claimant had numerous skills, including administrative skills in his position as a council member.
 {¶ 36} Moreover, there was evidence that claimant was paid for some of his activities. However, even if he had received no pay at all, the activities demonstrated his ability to perform the same type of work for remuneration and thus supported a termination of PTD compensation. Even though claimant may have charged little or no money for his services, his ability to perform these services contradicted his assertion that he was medically and vocationally unable to perform any work. Given all the evidence, the commission was within its discretion as the finder of fact to determine that claimant's activities showed that he was capable of performing sustained remunerative employment.
 {¶ 37} With regard to the finding of fraud, the magistrate acknowledges that the record includes evidence that could have been persuasive to a finder of fact in reaching the conclusion that there was no fraud: claimant's receipt of very little money for his services, the public-service nature of many of the activities, and his open admission to a colleague of his disability status. The magistrate believes, however, that it was for the finder of fact to determine the credibility of evidence and to make findings on matters such as the claimant's intent. The commission cited evidence in which claimant's representations about his activities were refuted by evidence of his actual activities. In sum, the commission was within its discretion to assess the evidence as it did.
 {¶ 38} Based on all the foregoing, the magistrate concludes that claimant has not met his burden in mandamus of proving an abuse of discretion by the commission. Accordingly, the magistrate recommends denial of the requested writ.